IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 1:13-CV-02460-BNB

SAMANTHA J. DANIELS,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

Defendant.

---

**ORDER**

---

The plaintiff seeks review of the Commissioner's decision denying her claim for supplemental security income benefits under Title XVI of the Social Security Act. The court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3). The matter has been fully briefed, obviating the need for oral argument. The decision is AFFIRMED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 16, 2007, the plaintiff filed an application for child's insurance benefits based on disability and an application for supplemental security income benefits. In both applications, she alleged disability beginning November 5, 2005. The applications were denied on July 25, 2007. The plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), which was held on September 11, 2008. In a decision dated October 8, 2008, the ALJ found that the plaintiff had the residual functional capacity to perform sedentary work with no more than occasional bending and stooping; the plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy; and, therefore, she was

not disabled. The Appeals Council denied the plaintiff's request for review. *Social Security Administrative Record* [Doc. #9] (the "Record"), p. 17.[1]

On April 19, 2011, the plaintiff filed an application for supplemental security income benefits which alleged disability based on a back injury, whiplash, and insomnia beginning April 11, 2005. Id. at pp. 137-43. The application was denied on June 7, 2011. Id. at p. 80. The plaintiff requested a hearing which was held on June 6, 2012. Id. at pp. 86-90; 26-52. The plaintiff was 24 years old at the time of the hearing. Id. at p. 151. The ALJ issued a written decision on June 13, 2012, finding that the plaintiff is not disabled. Id. at pp. 14-25. The plaintiff filed a request for review by the Appeals Council. Id. at p. 11. The Appeals Council denied the plaintiff's request. Id. at pp. 1-4. The ALJ's decision is final for purposes of this court's review. 20 C.F.R. § 404.981.

On May 18, 2010, the plaintiff saw Dr. Jack Rook, M.D., for a follow-up evaluation at Intermountain Rehabilitation Associates, Inc. She was in no apparent distress; her gait was normal; her balance was steady; and she did not exhibit any pain behaviors. Dr. Rook stated that "she continues to have compelling low back discomfort." He documented that the plaintiff had tried immediate release morphine but it was too short-acting for her. She did better on MS Contin and wanted to restart that medication. She continued to have difficulty sleeping despite taking Klonopin. Dr. Rook noted that "[s]he continues with an independent exercise program." He prescribed MS Contin for pain, Ambien for sleep, and Soma as a muscle relaxant. He recommended follow-up in three months and continuation of the independent exercise program.

---

[1]I refer to the official page numbers of the Record which are found on the lower right-hand corner of each page, not to the page numbers that are assigned by the court's docketing system.

Id. at p. 214.

On August 18, 2010, the plaintiff saw Dr. Rook for a follow-up evaluation. Dr. Rook documented that she continued "to struggle with low back pain." He noted that her sleep was slightly improved with Ambien, and she had "a lot of muscle spasms and in the past she has tried Valium at night" which helped her to sleep in combination with the Ambien. Dr. Rook discontinued the Klonopin and started the plaintiff on Valium, 10 mg. at night. He noted that the plaintiff has had "multiple injections which were not helpful." Based on her MRI, he found that "she does not appear to have surgical pathology." He renewed the MS Contin and Ambien prescriptions. He found that she was in no apparent distress; she had a normal gate; her balance was steady; and she did not exhibit any pain behaviors. He stated he would continue to see her at three-month intervals, and if she had any problems before her next visit, she should contact him. Id. at p. 213.

The plaintiff saw Dr. Rook again on November 17, 2010. He noted that she continued to "struggle with severe low back pain" which had been increasing with the colder weather. He recommended that she see a chiropractor for a short course of manipulation treatment. He also noted that she was having difficulty sleeping because of increasing back pain. He recommended that she take Ibuprofen prior to her bed time, and he renewed her MS Contin, Ambien, and Valium. He documented that she was in no distress, did not exhibit pain behaviors, had a normal gate, and had steady balance. He stated he would continue to see her at three-month intervals, and if she had any problems before the next visit, she should contact him. Id. at p. 212.

At the same visit, Dr. Rook completed a "Physical Restrictions Form." He indicated that the plaintiff could sit, stand, and walk for one hour at a time; sit for three to four hours per day;

stand and walk for one hour per day; occasionally kneel, climb stairs, reach above her shoulders, and lift, carry, push, or pull 10 pounds; occasionally drive; repeatedly use her upper arms; and never bend, twist, crouch, crawl, climb ladders, or repeatedly use her lower arms. He further indicated that the plaintiff "must have the freedom to change positions frequently." Dr. Rook indicated that his recommendations were permanent. Id. at p. 208.

On February 17, 2010, the plaintiff saw Dr. Rook for her three-month follow-up. She continued to complain about severe low back pain and numbness in both legs. Her pain was worse during the cold weather months. Dr. Rook stated that she had not had any "further treatment" since he last saw her. The Ibuprofen did not help her pain. Dr. Rook renewed the other medications. He stated that "[i]t might be worthwhile proceeding with somatosensory evoked potentials to determine if there is a neurological abnormality accounting for the patient's complaints of numbness in both legs. A prior electrical study was unrevealing for acute nerve injury. However, the typical electrodiagnostic study does not assess for sensory abnormalities." He documented that she was in no distress, did not exhibit pain behaviors, had a normal gate, and had steady balance. Id. at p. 211.

On June 7, 2011, state agency physician Alan Ketelhohn, M.D., noted that the plaintiff "does have documented back pain, however she reports that she is able to lift 10 lbs, and walk 1/4 mile, drive and takes care of rescued horses." Id. at p. 63. Based on Dr. Ketelhohn's review of the plaintiff's records, he determined that the plaintiff could frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) a total of two hours; sit (with normal breaks) for a total of six hours in an eight hour workday; frequently climb ramps/stairs; occasionally climb ladders, ropes, or scaffolds; occasionally stoop; occasionally kneel; and frequently crouch. Id. at

pp. 63-65.

On October 14, 2011, Dr. Rook completed a "Physical Capacity Evaluation" form. He indicated that the plaintiff could sit for six out of eight hours; stand and/or walk for two out of eight hours; lift and carry 10 pounds on an occasional basis; use her hands frequently; would have to miss more than two days per month because of pain and/or fatigue; and would need to lie down periodically throughout the day due to pain and/or fatigue. He further indicated that those limitations had been present since August 1, 2008. Id. at p. 221.

On April 17, 2012, the plaintiff presented to Family Medical Clinics with a chief complaint of "bulging discs in back." Id. at pp. 222-23. She reported that she suffered a work injury after lifting in 2005; "improved with horseback"; bulging discs after a motor vehicle accident in 2008; and numbness to the legs. The care provider[2] documented that the plaintiff did not have joint pain, muscle pain, numbness, or weakness; had normal musculoskeletal strength, tone, and gait; did not have any bony point tenderness or spasms; and had a normal straight leg raise test. The care provider documented that the plaintiff could sit for four hours; stand and walk for one hour; sit for 30 minutes at a time; and stand and walk for five to ten minutes at a time. The plaintiff was to follow-up in one week and bring her past medical records and scans with her. Id. at p. 223.

The plaintiff returned to Family Medical Clinics on May 1, 2012. The care provider documented that the plaintiff's last MRI showed no abnormalities; Dr. Rook diagnosed the plaintiff with facet arthropathy; and the plaintiff "has limitations listed from 2008." The

---

[2]The care provider's signature is illegible. It appears that the initials "NPL" appear after the signature. Id. at p. 223.

plaintiff's back was not examined. The care provider noted that another MRI was needed and started the plaintiff on Baclofen and Gabapentin. Id. at p. 224.

The plaintiff was seen at the Family Medical Clinics on May 31, 2012, for the results of her MRI. She was not examined. The care provider stated that the MRI showed "mild bilateral facet hypertrophy" but was otherwise negative. The plaintiff was referred to Memorial Pain Institute. The Baclofen was renewed. The care provider documented that the Neurontin was not working and prescribed Elavil. Id. at p. 228.[3]

At the ALJ hearing on June 6, 2012, the plaintiff testified that she had worked for a short time as a secretary at a horse stable. She was able to perform the duties that were required of her, but she was terminated because she wanted to go on the tours with the horses, and her employer did not think it was safe given her prior injury. Id. at p. 30. Her job as a secretary included paperwork, phone calls, taking pictures of the trail rides, and cleaning horse manure from the street and the trail. She was able to do the majority of the job but could not lift the manure carts because they weighed between 50 and 100 pounds. Id. at p. 31. She did not often get a lunch break, but was able to take "a lot of breaks to stand up and walk around the office." She would take a five to ten minute break once or twice an hour. Id. at p. 49.

The plaintiff further testified that while working at Taco Bell in 2005, she injured her back when she attempted to throw a bag in the trash dumpster. She said she heard a very loud pop, her back compressed, and she felt automatic pain. She was seen by a workers' compensation physician and her own doctors. The case ultimately settled for $35,000.00. Id. at

---

[3]The plaintiff was also seen at Family Medical Clinics on April 8, 2013, for a possible abdominal wall hernia. No mention of her back is made in the medical record on that date. Id. at p. 225.

pp. 32-33. The plaintiff began seeing Dr. Rook in late 2008 or early 2009. She stopped seeing him in February 2011 because he "was on a lien," but she went back to him one time in October. The plaintiff started going to Family Medical Clinics in April 2012 because they accept patients who do not have money or insurance. Id. at pp. 33-34. She saw a chiropractor twice a week for two months in 2008 when she was seeing Dr. Rook. Id. at pp. 39-40. Between the time she stopped seeing Dr. Rook and the time she started going to Family Medical Clinics, she spent all of her time looking for medical treatment. Id. at pp. 34, 49.

The plaintiff stated that she has had the same lower back pain since 2008. Id. at pp. 34-35. It feels like a knife went into her spine and has "a tendency" to feel like a "vice grip type clenching." The pain is present all day every day. The plaintiff gets up and moves around to try and alleviate the pain. The only thing that "helps [her] at all is at night when [she] can take prescription medications and try to go to sleep." Id. at p. 35. She testified that Dr. Rook told her she was not a surgical candidate because she was too young. Id. at pp. 37-38.

The plaintiff stated that she cannot feel either of her legs "at all" from "the hip down." Id. at p. 38. The numbness in her legs causes her to trip over herself and she walks into tree branches, cars, and truck bumpers and does not feel anything. She does not use a cane or any other device to help her walk. Id. at p. 39.

The plaintiff can sit for "a couple of minutes" before her back starts hurting. She tries not to lift more than 10 pounds. Id. at p. 40. She cannot stand in place for more than two or three minutes. If she shifts her weight and walks around "a little bit," she can be on her feet for 10 to 15 minutes. She averages only four to five hours of sleep at night because the pain wakes her. Id. at p. 41.

She does not have any trouble with personal care such as showering and dressing, but has "a feeling its going to be inevitable." Id. at pp. 41-42. The biggest problem she has had with personal care is that she has not been able to shave the bottom part of her legs for years. She has not done any housework (cooking, cleaning, vacuuming, mopping, or laundry) for at least two years. She can "gather laundry if its light clothes." She does not go grocery shopping. Id. at p. 42. A typical day is spent making sure the chickens and ducks have food and water; hunting for their eggs; taking her dog to the ranch to visit the horses for an hour or two; and petting and brushing the horses. She does not ride horses any more. Id. at pp. 43-44. She throws the ball for her dogs, but cannot clean the yard "as often as [she would] like." Id. at p. 44. She spends a couple of hours every day visiting her wheelchair-bound mother. She walks with her into the bathroom and gets her food and drink. Id. at p. 45. She visits the horses one more time before going home for the night. She also visits with people at the horse stable. Id. at . 46.

Her pain is not as bad in the morning. She rates it 7 out of 10. As the day progresses, the pain gets worse. It jumps to 7 ½ to 8 when she is with her mother. Id. at p. 47.

## II. STANDARD OF REVIEW

Review of the Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence. Hamilton v. Secretary of Health and Human Services, 961 F.2d 1495, 1497-98 (10th Cir. 1992); Brown v. Sullivan, 912 F.2d 1194, 1196 (10th Cir. 1990). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. Brown, 912 F.2d at 1196. It requires more than a scintilla but less than a preponderance of the evidence. Hedstrom v. Sullivan, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is

overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993). Although a reviewing court should meticulously examine the record, it may not reweigh the evidence or substitute its discretion for that of the Commissioner. Id.

## III. THE LAW

A person is disabled within the meaning of the Social Security Act only if his physical and mental impairments preclude him from performing both his previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2). "When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination." Campbell v. Bowen, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)). However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Social Security Act. To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months. See Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled:

1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the

      medical findings.

      2.   The ALJ must then determine whether the claimed impairment is "severe." A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

      3.   The ALJ must then determine if the impairment meets or medically equals in severity certain impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

      4.   If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant has the residual functional capacity ("RFC") to perform his past work despite any limitations.

      5.   If the claimant does not have the RFC to perform his past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and RFC.

20 C.F.R. §§ 404.1520(a)-(f). See also Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988).

      The claimant has the initial burden of establishing a disability in the first four steps of this analysis. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). The burden then shifts to the Commissioner to show that the claimant is capable of performing work in the national economy. Id. A finding that the claimant is disabled or not at any point in the five-step review is conclusive and terminates the analysis. Casias v. Secretary of Health & Human Services, 933 F.2d 799, 801 (10th Cir. 1991).

## IV. ANALYSIS

The ALJ found that (1) the plaintiff has not engaged in substantial gainful activity since she filed her application on April 19, 2011; (2) the plaintiff has the following severe impairments: back and leg pain secondary to possible lumbar facet arthropathy; (3) the plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1; (4) the plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except that she can frequently lift and/or carry ten pounds, stand and/or walk for two hours in an eight-hour day, sit for six hours in an eight-hour day, frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolding; occasionally stoop, kneel, and crawl; and she must be allowed to alternate sitting and standing as needed; (5) the plaintiff has no past relevant work; (6) there are jobs that exist in significant numbers in the national economy that the plaintiff can perform; and (7) the plaintiff has not been under a disability as defined by the Social Security Act since April 19, 2011, the date she filed her application. *Record*, pp. 19-24.

The plaintiff argues that the ALJ erred because she did not give Dr. Rook's opinions proper weight; instead, she gave "some weight" to a 2010 assessment by Dr. Rook, and stated that the limitations in Dr. Rook's 2011 assessment had "no objective evidence" to support them. *Plaintiff's Opening Brief*, pp. 10-11; 13.[4]

---

[4]The plaintiff also advances the following blanket arguments: (1) the ALJ's evaluation of the medical opinions was based on the wrong legal standard and not supported by substantial evidence; and (2) the ALJ's residual functional capacity assessment was based on a wrong legal standard and not supported by substantial evidence. Id. at 1; 9; 13. The plaintiff's only developed arguments are as stated above. I address only the developed arguments. It is not a judicial function to search the record for evidence in favor of the plaintiff. See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995). It is the litigants' responsibility

The opinion of a treating physician as to the nature and severity of a claimant's impairment is entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).[5] The Tenth Circuit Court of Appeals has stated:

> Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons in the notice of determination or decision for the weight assigned to a treating physician's opinion. Further, the notice of determination or decision must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. . . .
>
> The regulations and agency rulings give guidance on the framework an ALJ should follow when dealing with treating source medical opinions relating to the nature and severity of impairments. An ALJ should generally, give more weight to opinions from claimant's treating sources. In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for controlling weight. An ALJ should keep in mind that it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.

---

to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence. Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).

[5]By contrast, treating source opinions are not afforded any special significance or controlling weight in the determination of issues reserved to the Commissioner, such as the determination of a claimant's RFC. See 20 C.F.R. §§ 404.1527(e) and 416.927(e); Sosa v. Barnhart, 2003 WL 21436102 at *5 (D. Kan. April 10, 2003), adopted, 2003 WL 21418384 (D. Kan. Jun. 17, 2003). Nevertheless, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96-8p, 1996 WL 374184 at *7.

> The analysis is sequential. An ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is no, then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight. The agency ruling contemplates that the ALJ will make a finding as to whether a treating source opinion is entitled to controlling weight. . . .
>
> But resolving the "controlling weight" issue does not end our review. In completing the analysis[,] adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.
>
> Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.
>
> After considering the pertinent factors, the ALJ must give good reasons in the notice of determination or decision for the weight he ultimately assigns the opinion. Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so.

Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (internal quotations and citations omitted).

Here, the ALJ stated:

> The mild objective evidence does not support a finding of disability as defined by the Social Security Act, as amended. Jack L. Rook, M.D. saw the claimant in May 2010 for a follow-up evaluation for back pain (Exhibit B2F at 6). He indicated that the claimant's gait was normal, her balance was steady, and pain behaviors were absent (*id.*). He recommended that she continue with her independent exercise program and medications (*id.*). Dr. Rook saw her again three months later (*id.* at 5). He assessed that based on her MRI imaging, she did not appear to have surgical pathology (*id.*). He wrote in November 2010 that he had filled out an updated physical restriction form (*id.*). Dr. Rook thought in February 2011 that it might be worthwhile proceeding with somatosensory evoked potential to determine if there was a neurological abnormality for the claimant's complaints of numbness in both legs (*id.* at 3).
>
> * * *
>
> Dr. Rook assessed in November 2010 that claimant could sit for about three to four hours per day, stand for about an hour, and walk for about an hour (Exhibit B1F at 2). He indicated that the claimant could occasionally lift or carry up to ten pounds, with occasional limitations with the upper extremities, and no repeated use of the lower extremities (*id.*). Dr. Rook opined that the claimant needed the freedom to change position frequently (*id.*). Some weight is given to Dr. Rook's November 2010 assessment of the claimants exertional limitations, and the residual functional capacity above adopts some of his assessment where supported by a preponderance of the evidence.
>
> * * *
>
> Dr. Rook assessed in October 2011 that the claimant could sit for six hours, stand or walk for about two hours, and occasionally lift or carry ten pounds (Exhibit B6F). He indicated that the claimant would periodically need to lie down, would miss two days per month of work because of pain or fatigue, and could frequently use her hands (*id.*). Dr. Rook wrote that the limitations had been present since August 2008 (*id.*). There is no objective evidence to support Dr. Rook's opinion that the claimant needs to lie down periodically during an eight-hour workday, or that she would regularly miss work. On the other hand, much of the residual functional capacity above is consistent with Dr. Rook's opinion, as well as the state agency consultant's assessment. It appears that

> Dr. Rook's opinions relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.

*Record*, pp. 21-22.

The ALJ explained that she did not afford Dr. Rook's assessments controlling weight because the record lacked objective evidence to support all of those assessments. The ALJ further explained that Dr. Rook's notations regarding the plaintiff's level of pain were based on the plaintiff's subjective reporting of her symptoms rather than on the results of any objective testing. As for his objective assessments, Dr. Rook consistently documented that the plaintiff was not in any distress; her gait was normal; her balance was steady; and she did not exhibit any pain behaviors. The ALJ expressly rejected Dr. Rook's assessments that the plaintiff would need to lie down periodically during the workday and that she would need to miss two days per month because there was no evidence in the record to support the assessments. Notably, the plaintiff does not cite to any medically acceptable clinical or laboratory diagnostic techniques which support those assessments. To the contrary, the plaintiff acknowledges that "the MRI did not show surgical pathology and that the electrical study did not show nerve injury." *Plaintiff's Opening Brief*, p. 11.

The ALJ further explained that the plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible:

> The claimant's demeanor during the hearing appeared inconsistent; when the undersigned examined her, she appeared very uncomfortable because of pain, but very relaxed and comfortable while her representative questioned her. The claimant described daily activities that are not limited to the extent that one would expect, given the complaints of disabling symptoms and limitations. She testified that she is able to take care of horses,

> chickens, ducks, dogs, and cats, and visited her mother daily to help with light chores. She also testified that she was able to function as a secretary but had been unable to ride horses or manage fifty to one hundred pound bags of horse manure. As mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have been at least at times, somewhat greater than the claimant has generally reported. On the other hand, review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. (Exhibit B3D at 2). The residual functional capacity above gives much weight to the claimant's self-reported limitations and pain, as there is very little objective evidence to support a sedentary residual functional capacity.

*Record*, p. 23.

Thus, the ALJ provided legitimate reasons for the weight he assigned to Dr. Rook's opinions. The plaintiff complains that the ALJ did not specifically discuss each of the factors provided in 20 C.F.R. § 404.1527 and 416.927. *Plaintiff's Opening Brief*, p. 11-12. The ALJ is not required "to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007). The ALJ's decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id. The ALJ has fulfilled that requirement.

## V. CONCLUSION

I have reviewed the entire record. The record contains substantial evidence to support the ALJ's decision, and the correct legal standards were applied. I find no error in the ALJ's decision. Accordingly,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

Dated December 8, 2014.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge